[No. G036369. Fourth Dist., Div. Three. Mar. 6, 2007.]

HELENE HASSO, Plaintiff and Respondent, v.
RONALD D. HASSO et al., Defendants and Appellants.

**COUNSEL**

King & Parret and Charles W. Parret for Defendant and Appellant Ronald D. Hasso.

Law Offices of Dirk Van Tatenhove and Dirk Van Tatenhove for Defendant and Appellant Heather Hasso.

Latham & Watkins, Jon D. Anderson and Michael W. De Vries for Plaintiff and Respondent.

**OPINION**

**IKOLA, J.**—Unfortunately, but not surprisingly, classification of money flowing into a trust, particularly in seven- or eight-figure amounts, can become a focus of controversy that drives a stake into the heart of a family. Such is the case here, where a widow is the sole income beneficiary of a marital trust established by her deceased husband, and their grown son and daughter are remainder beneficiaries whose pecuniary interests are at odds with the mother's: Mother benefits from money allocated as income to the trust because it all goes to her; son and daughter are better served when such money is allocated to principal, to be stored up for their use at a later day.

The disparate interests of mother and children here compelled the trustee to petition the court for instructions about proper allocation—as income or principal—of millions of dollars in funds distributed to the trust by a subchapter S corporation of which the trust is a shareholder. The court determined as a matter of law the funds were to be allocated to income, thus the money goes to mother. The son and daughter appeal.

■ The general rule in California, established by statute, is unequivocal and simply stated: When money is received by a trust from a corporate entity of which the trust is a shareholder, the trustee shall allocate that money to income. (Prob. Code, § 16350, subd. (b).)[1] Here, the trust's lifetime income beneficiary contends the general rule applies. Opposing her are the remainder beneficiaries who argue the distributed funds must be allocated to principal, based on statutory exceptions or on other circumstances that make the general rule inapplicable.

Section 16350, subdivision (c)(1)–(4) embodies the statutory exceptions. Only two are relevant to our inquiry: Allocation to principal is appropriate (1) where "[m]oney [is] received in one distribution or a series of related distributions in exchange for part or all of a trust's interest in the entity" (§ 16350, subd. (c)(2)), or (2) where "[m]oney [is] received in total or partial liquidation of the entity" (§ 16350, subd. (c)(3)).

There are two statutorily defined methods of establishing partial liquidation under section 16350, subdivision (c)(3). Section 16350, subdivision (d)(1) provides: "Money is received in partial liquidation (A) to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation [the entity indication exception], or (B) if the total amount of money . . . received by all owners, collectively, in a distribution or series of related distributions is greater than 20 percent of the entity's gross assets, as shown by the entity's yearend financial statements immediately preceding the initial receipt [the 20 percent exception]."[2] The two methods are independent of each other: If the distributing entity "designate[s]" the distribution as a partial liquidation, it is so characterized "regardless of the percentage of total assets that it represents" (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1999 supp.) foll. § 16350, p. 72); on the other hand, if a distribution exceeds 20 percent of the entity's gross assets, "the entire

---

[1] All further statutory references are to the Probate Code unless otherwise stated.

[2] As a further qualifier, section 16350, subdivision (d)(2) provides: "Money is not received in partial liquidation, nor may it be taken into account under clause (B) of paragraph (1), to the extent that it does not exceed the amount of income tax that a trustee or beneficiary is required to pay on taxable income of the entity that distributes the money." This section is irrelevant to our discussion.

distribution is a partial liquidation under subsection (d)(2) [subdivision (d)(1)(B)] whether or not the entity describes it as a partial liquidation." (*Ibid.*)

The remainder beneficiaries contend the distributions constitute principal under section 16350, subdivision (c)(2) and under both definitions of the partial liquidation exception of section 16350, subdivision (c)(3), but they devote the bulk of their attention to the 20 percent exception. The question is whether the distribution or series of related distributions to the trust resulted from a partial liquidation of the distributing entity based on the greater than 20 percent distribution to gross assets ratio. (§ 16350, subd. (d)(1)(B).) We need look no further than the yearend financial statement reporting the entity's gross assets for the relevant period, which provides the definitive answer to the question: "No."

The remainder beneficiaries protest the trial court utilized the wrong figures in calculating the ratio, or relied on case authority that has since been discredited by the Legislature's amendment of the governing statute, or misinterpreted the law in other respects. We will discuss those issues more fully, *post.* But the bottom line is that under *any* scenario, the total series of related distributions to all shareholders, collectively, no matter how aggregated or extended over time,[3] does not approach, much less exceed, the requisite 20 percent of the entity's gross assets. And because, as a matter of law, no other statutory exception or contrary general statute applies, the distributed funds must be allocated to income. The trial court did not err in granting summary judgment to the lifetime beneficiary, denying the cross-motion of the remainder beneficiaries, and entering judgment instructing the trustee accordingly.

FACTS

Helene and Norman Hasso were married in August 1982. They had two children, Ronald and Heather, both now adults. In 1993, Norman established the Norman E. Hasso 1993 Trust, of which he was the sole trustee. He died at age 35 in 1994, and upon his death, his sister, May Hasso (trustee) became

---

[3] We grant Ronald's motion to take evidence of additional facts, so our calculations take into account the amount of related distributions made to shareholders, including the trust, after the court ruled on the cross-summary judgment motions and during the pendency of this appeal. We further include the as yet undetermined amount of the anticipated January 2007 final related distribution. With this evidence, we may determine the issues without further proceedings in the trial court. (Code Civ. Proc., § 909; Cal. Rules of Court, rule 8.252(c).)

the successor trustee.[4] The 1993 trust was divided into two subtrusts, the exemption trust and the marital trust. In 1995, Helene irrevocably disclaimed any interest in the exemption trust, thus only the marital trust is at issue here, and all further references to "the trust" designate the marital trust.

The trust expressly provides that the trustee's "determination of all matters with respect to what is principal and income of the trust estate and the apportionment and allocation of receipts and expenses between these accounts shall be governed by the provisions of the California Revised Uniform Principal and Income Act [section 16320 et seq.] from time to time existing." It further provides the trustee may exercise discretion in allocating funds between principal and income only if the act or a specific provision of the trust so allows.

Helene is the lifetime income beneficiary of the trust, under the terms of which the trustee must distribute all net income to Helene in quarter-annual or more frequent installments. Ronald and Heather are remainder beneficiaries.

*Holiday Retirement Corporation and Its Gross Assets at Year's End 2002*

The trust holds 17.2537 shares (14.7467 percent) of the common stock of Holiday Retirement Corporation (Holiday), a subchapter S corporation with headquarters in Salem, Oregon. Holiday owns and operates more than 260 retirement facilities located throughout the United States, Canada, the United Kingdom, and France. As of December 31, 2002, Holiday's yearend financial statement, the only statement relevant to this appeal, reported total gross assets of approximately $630 million, a figure confirmed by Holiday's chief financial officer, Donald K. Harris, at his deposition. The $630 million is calculated by combining $133,065,584 ($133 million) of "special purpose" gross assets, as listed on page 3 of the financial statement, with $496,926,000 ($497 million) in gross assets listed on page 7, note 1. Holiday explains in the financial statement that the latter $497 million in gross assets "should have been consolidated" under the requisite generally accepted accounting principles (GAAP), but were not because Holiday had an agreement with Prudential Insurance Company of America and Pruco Life Insurance Company to present a "special purpose" financial statement in compliance with the lenders' demand for segregated information pertaining only to Holiday's North American holdings, hence, the "special purpose" $133 million gross assets figure.[5]

---

[4] Hereafter, we refer to the parties respectively by their first names. We intend no disrespect; our practice simply facilitates ease of reference. For the same reason, we refer to Ronald and Heather collectively as Ronald.

[5] Prudential's loans to Holiday were underwritten based on Holiday's North American operations and profitability, excluding many of Holiday's other assets. The special purpose

*Holiday's Distributions*

In 2003, Holiday began making shareholder distributions derived from distributions it had received, in turn, from Holiday Europe LLC (Holiday Europe), in which Holiday held stock. Holiday Europe's assets included a French holding company named Financiere Serience and an office building in France, from which it derived substantial rental revenues.

Sometime around June 2003, Holiday Europe sold its stock in Financiere Serience for about $125 million and began a series of distributions to its shareholders, including approximately $71.5 million to Holiday. From that source, Holiday distributed $33.9 million to its shareholders in June 2003, and $1.85 million in February 2004. A portion of the proceeds from Holiday Europe's distributions relating to its sale of stock in Financiere Serience was placed in an escrow account in France to secure the representations and warranties made by Holiday Europe in the sale transaction documents.

*The Trustee's Petition for Instructions and the Cross-motions for Summary Judgment*

In February 2004, the trustee indicated to Helene that she intended to characterize Holiday's distributions from the Holiday Europe transaction as principal, except for the amount necessary to cover Helene's income taxes. Helene objected and filed a petition on April 1, 2004, seeking, inter alia, a declaration that the distributions constituted income. Consequently, the trustee petitioned the court under section 17200, subdivision (b)(6) for instructions, inter alia, "as to the proper classification as income or principal of the Holiday Europe Distributions."

Helene and Ronald filed cross-motions for summary judgment, the former arguing the distributions should be allocated to income under the general rule of section 16350, subdivision (b), the latter asserting they constituted principal under section 16350, subdivision (c)(2) (exchange for part or all of a trust's interest in the distributing entity) and/or (c)(3) (partial liquidation). The lynchpin of Ronald's partial liquidation argument was his utilization of

---

financial statement was prepared expressly to accord with the provisions of the loan agreement and to facilitate Prudential's analysis of assets supporting its loans. The special purpose figure accounted for Holiday's investments by utilizing the equity method of accounting. Holiday's financial statement describes the equity method of accounting: "[A]ll investments are carried at cost, less distributions received, adjusted for the Company's proportionate share of their undistributed earnings or losses and cumulative translation adjustments. Certain investment balances are also adjusted to conform with United States GAAP, including entries to reverse the amortization of goodwill that is not amortized under United States GAAP." Holiday explains, "This treatment is consistent with the loan agreements and covenants negotiated between the Company [Holiday] and its senior lenders."

Holiday's "special purpose" $133 million gross assets figure, rather than the true $630 million gross assets, for calculation of the 20 percent ratio. Helene contended neither exception applied because (1) the number and percentage of shares in Holiday owned by the trust were the same before and after the Holiday Europe distributions, (2) Holiday did not indicate, at or near the time of the distribution, that it was a partial liquidation of Holiday, and (3) the total funds received by all shareholders at that time, roughly $35 million, reached only about 6 percent of the entity's true gross assets as shown on Holiday's financial statement for the year ending December 31, 2002.

After taking the motions under submission, the trial court determined Holiday's distributions from the Holiday Europe transactions were to be characterized as income. In its minute order dated May 19, 2005, the court granted Helene's motion for summary judgment and denied Ronald's. Responding to Ronald's partial liquidation argument under the 20 percent definition, the court's order explained, "The distribution which is the subject of the controversy clearly was less than the 20 [percent] of Holiday's Gross Assets and therefore was not a 'partial liquidation' [citation to section 16350 and *Estate of Thomas* (2004) 124 Cal.App.4th 711 [21 Cal.Rptr.3d 741]]." The court declined to rule on certain of Ronald's evidentiary objections, noting "none of the objected to contents of [certain declarations] were considered in arriving at the . . . decision." The minute order makes no mention of the partial liquidation/entity indication exception defined in section 16350, subdivision (d)(1)(A) or the additional ground urged by Ronald that the distribution constitutes principal because it was received in exchange for the trust's interest in Holiday. (§ 16350, subd. (c)(2).)

Before continuing, we set the court's order in context by explaining the legal precedent upon which the court relied, as well as subsequent developments. While the court's decision on Helene's and Ronald's respective motions for summary judgment was pending, the Court of Appeal issued its decision in *Estate of Thomas, supra*, 124 Cal.App.4th 711 (*Thomas*), interpreting how the partial liquidation/20 percent ratio should be calculated. The *Thomas* court held that under section 16350, subdivision (d)(1)(B), the numerator of the ratio fraction is the amount of the distribution received by the shareholder (here, the trust received approximately $5.3 million), rather than the total amount distributed to *all* shareholders, collectively (here, about $35.7 million at the time), and the denominator is the distributing entity's gross assets as set forth on the relevant yearend financial statement for the year immediately preceding the distribution. (*Thomas, supra*, 124 Cal.App.4th at pp. 719–722.)

Taking note of the *Thomas* decision, the trial court allowed Ronald and Helene to submit supplemental briefs about what effect, if any, the case had on the pending summary judgment motions. The court's minute order alludes to the *Thomas* case as authority for granting Helene's summary judgment motion. However, before judgment was entered, the Legislature, disapproving of *Thomas*'s interpretation, enacted, as an emergency measure, the amended section 16350, subdivision (d)(1)(B) which we cited at the outset of this opinion. The amended statute makes clear that the numerator should be the total amount of the distribution or series of distributions to *all* shareholders, collectively.

In light of the Legislature's reaction to the *Thomas* decision, and the then pending Senate Bill No. 296 (2005–2006 Reg. Sess.) proposing the soon-to-be-adopted amendment to section 16350, subdivision (d)(1)(B), Ronald moved the court for reconsideration. Rejecting Ronald's arguments and denying his motion, the court found the proposed legislation was not retroactive and *Thomas*'s interpretation of section 16350 "was binding precedent on the court at the time the Court made its decision on the Cross-motions for Summary Judgment."[6]

The court then entered judgment in favor of Helene, stating in pertinent part: "The distributions referenced in May Hasso's Petition as the 'Holiday Europe Distributions,' which included distributions from Holiday Retirement Corp. ('Holiday') to the Norman E. Hasso Marital Trust and the Norman E. Hasso GST Exempt Marital Trust (collectively, the 'Marital Trust') in June 2003 in the amount of $5,003,524.71 and in February 2004 in the amount of $272,368 shall be treated entirely as income under . . . § 16350."

*Subsequent Distributions*

Pursuant to Ronald's motion to take evidence of additional facts (see fn. 3, *ante*), we note that after the court's determination of the cross-motions for summary judgment, and again during the pendency of this appeal, Holiday made a series of distributions related to the Holiday Europe transactions as follows: On July 21, 2005, it distributed to its shareholders $3,223,799.37 (rounded to $3.2 million), representing 50 percent of Holiday's share of funds released from Holiday Europe's escrow account pertaining to Holiday Europe's 2003 sale of its stock in Financiere Serience; on July 13, 2006, it

---

[6] Ronald posits that the amended statute simply clarifies existing law, thus there is no need to resort to retroactive application, but argues that in any case, retroactivity is appropriate. Helene takes the opposite position. For our purposes, the point is academic, and we need not discuss or decide it: Whether one considers only the distributions to the trust, as *Thomas, supra*, 124 Cal.App.4th 711 prescribes, *or* the distribution to all shareholders, collectively, under the amended statute, no ratio exceeding 20 percent of Holiday's $630 million true gross assets is achieved.

made a like distribution of $3,379,387.56 (rounded to $3.4 million) representing the remainder; on November 10, 2006, it announced the distribution of an additional $3,706,000 (rounded to $3.7 million) derived from the sale of one floor of the French office building; and it announced it expected to close the sale of the last remaining office space in the building in January 2007.

At this point, we observe the inescapable fact that even taking into account the additional distributions of some $10.3 million, the entire series of Holiday's related distributions to all shareholders, collectively and over time, totals about $46 million, far less than the amount needed to exceed 20 percent of the true $630 million gross assets of Holiday, as reported on Holiday's yearend financial statement for 2002, the year immediately preceding the distribution. Moreover, whatever additional amount might be realized from the anticipated sale of the remaining space in the French office building has no potential for changing the result. This is clear from the trustee's verified petition, in which the trustee states, "[F]ollowing [Holiday Europe's sale of the remaining space in the office building, Holiday] expects to receive from Holiday Europe, and to distribute to its shareholders, approximately $3.5 million." Moreover, at oral argument, Ronald's counsel advised us that sale of that same remaining office space is now in escrow, with a purchase price of $2.4 million. Holiday's share of that will be $1.2 million, and Holiday has stated its intention to distribute the entire $1.2 million to its shareholders.

## DISCUSSION

### Standard of Review

On the grant of a summary judgment, the appropriate standard of review is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854–855 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The judgment must be affirmed if all the papers submitted show there is no triable issue as to any material fact and the respondent is entitled to judgment as a matter of law. (*Assad v. Southern Pacific Transportation Co.* (1996) 42 Cal.App.4th 1609, 1612 [50 Cal.Rptr.2d 443].) "We review the trial court's ruling, not its rationale; thus, we are not bound by the trial court's stated reasons for granting summary judgment." (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 338 [17 Cal.Rptr.3d 66].) Therefore, although Code of Civil Procedure section 437c, subdivision (g) requires the trial court to specify by written or oral order the reasons for its grant of summary judgment on the ground that there is no triable issue of material fact, the trial court's "failure to provide a sufficient statement of reasons is not automatically a ground for reversal. . . . Where our independent review establishes the validity of the judgment, any error is harmless." (*Ace American Ins. Co. v. Walker* (2004) 121 Cal.App.4th 1017, 1027 [18 Cal.Rptr.3d 1], citation omitted.)

*The Distributions Constituted Income, Not Principal, Under the 20 Percent Exception Defined in Section 16350, Subdivision (d)(1)(B)*

Because the parties have made the 20 percent exception the central issue of the appeal, and because in its order granting summary judgment to Helene the trial court focused exclusively on that issue, we discuss it first. As should be apparent from our recitation of facts, there is little to say about Ronald's contention that under the 20 percent exception the series of distributions to all shareholders, collectively, constituted a partial liquidation of the distributing entity, Holiday, and thus should have been allocated to principal under section 16350, subdivision (c)(3). Ronald's assertion is *entirely* dependent upon our acceptance of his "special purpose" $133 million gross assets figure as the correct denominator in the calculation. But neither in his briefs nor at oral argument did Ronald cite a legal authority or present a logical reason why we should turn a blind eye to the $497 million in gross assets which Holiday admitted were intentionally excluded from the "special purpose" figure to accord with the lenders' specifications regarding, inter alia, segregation of North American properties.

It is no answer to assert, as Ronald does, that Holiday routinely prepares yearend financial statements following the same lender-driven "special purpose" format, i.e., "This is the way we always do it." Nor is Ronald's position advanced by his argument that section 16350, subdivision (d)(1)(B), defining the 20 percent exception, does not take into account the possibility that a financial statement might contain *two* gross assets figures for two different purposes. According to Ronald, if the Legislature had wanted a rule governing a financial report such as Holiday's, with gross asset figures located in two places, it would have devised one. Since it did not, the distributions must "default" to principal under the cleanup statute, section 16335, subdivision (a)(4), providing that a trustee "[s]hall add a receipt . . . to principal to the extent that the trust or the will and this chapter do not provide a rule for allocating the receipt . . . to or between principal and income." We unhesitatingly reject this argument, noting it lacks common sense and its suggested rule would wreak havoc. (See, e.g., *Coast Electric Co. v. Industrial Indemnity Co.* (1983) 144 Cal.App.3d 879, 882 [193 Cal.Rptr. 74] [longstanding rules forbid statutory construction leading to an absurd result].)

The financial statement itself, without reference to any other evidence, bears indisputable witness that the entire $630 million in gross assets is the *true* figure reported on the relevant yearend financial statement, and that figure alone is appropriate. What more is there to say? Aggregating all related distributions, past and anticipated, to all shareholders, collectively, Ronald cannot obtain a numerator higher than $48 million, i.e., less than 8 percent of gross assets. To achieve the greater than 20 percent of gross assets required

by the statute, Holiday would have to show a total of more than $126 million in distributions. It falls short by $78 million. This is not a close call.

*The Distributions Did Not Constitute a Liquidation or Partial Liquidation Under the Entity Indication Exception*

■ Ronald contends the distributions from the Holiday Europe series of transactions should be allocated as principal under section 16350, subdivision (c)(3) because Holiday indicated it was in partial liquidation of Holiday at or near the time of distribution, thus the exception defined in section 16350, subdivision (d)(1)(A) applies. The statute provides that a partial liquidation occurs under section 16350, subdivision (c)(3) "to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation." (§ 16350, subd. (d)(1)(A).)

The record references upon which Ronald relies to demonstrate the entity indication exception do not support his argument or create a triable issue of fact. They simply show that Holiday advised its shareholders that Holiday Europe was selling its stock in Financiere Serience and intended to divest itself of a French office building as well, and make distributions to its shareholders, including Holiday. Neither Holiday's announcement of that anticipated event nor any other correspondence or communications to which Ronald alludes constituted Holiday's indication, at or near the time of distribution, that it was partially liquidating Holiday.

Ronald argues the word "indicate," as used in section 16350, subdivision (d)(1)(A) cannot be construed to require the distributing entity to actually use the label "partial liquidation" when advising the shareholders a major asset will be sold and funds distributed. He contends, rather, that such a transaction is a partial liquidation by definition, thus the advisement of the transaction itself automatically gives rise to a presumption constituting the requisite statutory "indication." We disagree. According to the Law Revision Committee comments, noted *ante*, an entity's "indication" under section 16350, subdivision (d)(1)(A) is a "designation" or "description" (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code, *supra*, foll. § 16350, p. 72), which, contrary to Ronald's test, implies at least *some* degree of specificity is necessary to advise the shareholders the entity is being partially liquidated. Moreover, the transaction need not involve "a major asset," as Ronald suggests, because if the distributing entity designates the partial liquidation as principal, it is so characterized "regardless of the percentage of total assets that it represents." (*Ibid.*) Indeed, this is the point at which the entity indication exception essentially dovetails with the 20 percent exception because, if a distribution exceeds 20 percent of the entity's gross assets, "the

entire distribution is a partial liquidation under subsection (d)(2) [subdivision (d)(1)(B)] whether or not the entity describes it as a partial liquidation." (*Ibid.*)

█ We need not decide precisely what language the distributing entity must use to "indicate" that a partial liquidation is taking place, but we do decide that a simple advisement that an asset has been converted into cash for distribution does not a fortiori give the notice envisioned by section 16350, subdivision (d)(1)(A). Moreover, we note Holiday's board declined Ronald's self-serving invitation to pronounce unequivocally its distributions as partial liquidation, instead responding in a resolution stating, "The Board is not capable to say how such facts should be characterized under the California Probate Code." It appears the board was as uncertain that *Holiday Europe*'s sale of its stock in Financiere Serience and its ownership of space in the French office building actually constituted a partial liquidation of *Holiday* as was the trustee, who asked the court to decide.

Our final observation about the entity indication exception concerns Ronald's reliance on a nearly 40-year-old California case, *Estate of Talbot* (1969) 269 Cal.App.2d 526 [74 Cal.Rptr. 920], and a Pennsylvania case of about the same vintage, *Anthony Estate* (1966) 423 Pa. 401 [223 A.2d 857], cited by the *Talbot* court. Both cases determined that distributions to the respective trusts from E. I. du Pont de Nemours and Company, a corporation in which the trusts were shareholders, should be deemed a partial liquidation because the funds derived from du Pont's sale of General Motors stock constituting a substantial percentage of du Pont's assets. Ronald argues these cases are "consistent with California law prior to the Act." That, of course, is the problem. Whatever value they had for determining either "entity indication" or distribution to gross assets ratio, the Legislature decided statutory definitions were needed. Thus, we now have section 16350, subdivision (c)(3), the partial liquidation statute, and section 16350, subdivision (d)(1)(A) and (B), defining the two methods of determining whether a partial liquidation has occurred. In light of the legislation, the value of these cases in the present controversy is purely archival.

There is no triable issue of fact with regard to the entity indication exception. As noted, *ante*, we may so conclude because the parties fully addressed the issue both in the trial court and on appeal, even though the trial court neglected to mention it in its order. (*McIntosh v. Mills, supra*, 121 Cal.App.4th at p. 338; *Ace American Ins. Co. v. Walker, supra*, 121 Cal.App.4th at p. 1027.)

*The Distributions Were Not Made in Exchange for the Trust's Stock in the Distributing Entity*

Ronald contends the distributions were made in exchange for the trust's stock in Holiday and thus constituted principal under the exception set forth in section 16350, subdivision (c)(2). The undisputed evidence shows the distributions did not alter or reduce the trust's share ownership of Holiday (17.2537 shares) or its percentage ownership of Holiday (14.7469 percent), which are the only facts that matter. There is no triable issue of fact as to the applicability of this exception, a determination we make independently, even though the trial court failed to indicate its decision on this ground. (*McIntosh v. Mills, supra,* 121 Cal.App.4th at p. 338; *Ace American Ins. Co. v. Walker, supra,* 121 Cal.App.4th at p. 1027.)

*The Court's Failure to Rule on Ronald's Evidentiary Objections Is Not Reversible Error*

Ronald argues certain declarations submitted by Helene pertaining to her income tax liability were inadmissible. Ronald objected to the evidence, but the court declined to rule on the objections, stating it had not considered the declarations in reaching its decision. Ronald assigns this as error.

It should come as no surprise that the court did not concern itself with Helene's income tax liability. Section 16350, subdivision (d)(2) provides, "Money is not received in partial liquidation, nor may it be taken into account [in the 20 percent ratio calculation], to the extent that it does not exceed the amount of income tax that a trustee or beneficiary is required to pay on taxable income of the entity that distributes the money." Helene's income tax liability did not matter: Exclusion of the evidence could have resulted in a larger distribution figure, but not sufficiently to exceed the requisite 20 percent of Holiday's $630 million true gross assets as reported on Holiday's yearend financial statement. Moreover, even assuming the court erred in failing to rule on Ronald's evidentiary objections, Ronald must show how he was harmed (Cal. Const., art. VI, § 13), and he would be hard put indeed to argue he was prejudiced by the court's failure to consider the very evidence he claimed was inadmissible.

*The Judgment Conforms with the Pleadings and Does Not Exceed Their Scope*

Ronald contends the judgment must be reversed because the trustee's petition for instructions sought a ruling only as to the proper *classification* of the Holiday Europe distributions, but the judgment directs the trustee that certain components of the series of related distributions, specifically the June

2003 and February 2004 distributions, "shall be *treated* entirely as income under [section] 16350." (Italics added.) Ronald argues that in using the word "treat," as opposed to "characterize," the court usurped the trustee's discretion "to adjust receipts under [section 16336, subdivision (a)]." The picayune semantic game is unavailing. The trustee came to the court *precisely* to obtain instructions about whether the series of distributions were to be allocated to principal or income. The court's response was that the distributions, *including* the two mentioned by Ronald, but not, as Ronald claims, *exclusive* to those, were entirely income. In context of the trustee's petition and the court's decision, the choice of the word "treat" instead of the word "characterize" cannot be read as having anything whatsoever to do with the trustee's discretion, if any, to *adjust* the allocation between principal and income under the conditions specified in section 16336. Whether circumstances exist that would allow the trustee to exercise such discretion was not an issue presented to the trial court on the cross-motions for summary judgment and we express no opinion on the issue. Accordingly, Ronald's argument in this regard provides no basis for reversal. Similarly, we express no opinion as to whether the judgment is res judicata on the section 16336 issue on the ground it *could* have been raised in this case.

Undeterred, Ronald protests that *prior* to the petition for instructions, the trustee had already made up her mind the distributions constituted principal, based on the advice of at least one attorney and two accountants. Assuming that is true, so what? Helene objected to the trustee's characterization, the trustee asked the court to decide, and the court did. The trustee's state of mind going into the proceedings is irrelevant, and Ronald's argument the court should have deferred to the trustee's initial assessment or given it more weight is absurd.

Finally, we note that throughout the proceedings, Ronald has contended that the *series* of distributions relating to the Holiday Europe transaction must be deemed seamless and considered in toto to determine the issue of partial liquidation. At oral argument, he assured us that if we took evidence of the remaining distributions, including those still anticipated, we would be able to determine the issues raised in the petition without further proceedings in the trial court. Nonetheless, Ronald argues the 20 percent issue was not "ripe" for decision because some of the distributions occurred *after* the court issued its order and some are yet to come. Ronald cannot have it both ways. The petition itself placed before the court the series of related distributions, completed or not, and the court got it right.

## CONCLUSION

The court correctly determined the subject distributions to the trust constitute income, not principal. There are no triable issues of material fact.

Holiday did not indicate at or near the time of distribution it was in partial liquidation. The total amount of money and property received by all owners, collectively, was less than 20 percent of the entity's gross assets, as shown by the entity's yearend financial statements immediately preceding the initial receipt. Finally, the distributions were not received by the trust in exchange for part or all of its interest in Holiday.

Our disposition moots Ronald's argument that the court erred in denying his motion for reconsideration or for new trial. Moreover, we may deem these issues waived because Ronald's brief fails to present any supporting legal argument. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545–546 [35 Cal.Rptr.2d 574].)

## DISPOSITION

The judgment is affirmed. Helene shall recover her costs on appeal.

Bedsworth, Acting P. J., and Aronson, J., concurred.

Petitions for a rehearing were denied April 4, 2007, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 16, 2007, S151873.